IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CYNTHIA TAYLOR,

        Appellant,

 v.

NICHOLSON-WILLIAMS, INC.
D/B/A COLDWELL BANKER
COMMERCIAL BENCHMARK,
KELLY BUSH, WILLARD
BARLOW NICHOLSON, III,
SOUTHEAST GEORGIA
ACQUISITIONS, LLC, ET AL.,

        Appellees.

Case No.  5D22-1410
LT Case No. 2018-CA-292

_____/

Opinion filed July 21, 2023

Appeal from the Circuit Court
for St. Johns County,
Howard M. Maltz, Judge.

Timothy S. Taylor, and Vanessa A. Van Cleaf, of
Taylor Corwin & Van Cleaf, PLLC, Coral Gables,
and Stephen J. Binhak, of The Law Office of
Stephen James Binhak PLLC, Miami, for
Appellant.

Therese A. Savona, of Cole, Scott & Kissane,
P.A., Orlando, and Michael A. Rosenberg, of
Cole, Scott & Kissane, P.A., Plantation, and
Robert E. O'Quinn, Jr. of Cole, Scott & Kissane,
Jacksonville, for Appellees, Nicholson-Williams,
Inc. d/b/a Coldwell Banker Commercial
Benchmark, Kelly Bush, and Willard Barlow, III.

No Appearance for Other Appellees.

CYNTHIA TAYLOR,
        Appellant,

v.

EDWARD SEGARS, SOUTHEAST
GEORGIA ACQUISITIONS, LLC,
ST. JOHNS LAW GROUP, P.A.,
DOUGLAS BURNETT, GULFSTREAM
DESIGN GROUP, LLC, MATTHEW LAHTI,
STEPHEN BEEN, KELLY BUSH, ET AL.,
        Appellees.

Case No. 5D22-1557
LT Case No. 2018-CA-292

_____/

Appeal from the Circuit Court
for St. Johns County,
Howard M. Maltz, Judge.

Timothy S. Taylor, of Taylor Corwin & Van Cleaf,
PLLC, Coral Gables, and Vanessa A. Van Cleaf,
of Taylor Espino Vega, PLLC, Stephen J. Binhak,
of The Law Office of Stephen James Binhak PLLC,
Miami, for Appellant.

Mary K. Simpson, William R. Sickler, and
Elizabeth M. van den Berg, of Guilday Law,
P.A., Tallahassee, for Appellee, Edward M. Segars.

No Appearance for Other Appellees.


PRATT, J.


      Appellant Cynthia Taylor, the seller of 102 acres of land in St. Johns

County, sued Edward Segars and various other parties (collectively, "the

brokers") who functioned as brokers for the $4 million transaction, asserting claims against them for civil conspiracy, fraud, negligent misrepresentation, breach of statutory duty, and negligent supervision. The Seventh Judicial Circuit granted the brokers' motions for summary judgment, and Taylor has appealed those rulings.[1] Her appeals require us to decide three questions: whether the purchase-and-sale contract bars Taylor's claims against the brokers; if the contract does not bar Taylor's claims, whether she has raised a factual dispute material to whether the brokers violated the duty of honest and fair dealing they owed to her under section 475.278, Florida Statutes (2022); and whether the summary judgments should be affirmed on the alternate ground that Taylor cannot prove damages.

Viewing the evidence in the light most favorable to Taylor, as we must, we hold that the contract does not bar Taylor's claims against the brokers; she has produced summary judgment evidence that the brokers breached their statutory duty to deal honestly and fairly with her; and the summary judgments cannot be affirmed on the alternative ground that the brokers press. We therefore reverse and remand.

---

[1] We consolidate both appeals for the purpose of issuing this opinion.

## I.

From 1993 until December 2018, Cynthia Taylor owned 102 acres of real property located at 7085 U.S. Highway 1 South in St. Augustine, Florida. The sale of her property unfolded over a two-year period. During that time, Taylor alleges, a developer devalued her land and scuttled an initial $5 million purchase agreement. Taylor further alleges that after she made plain her intention never to sell to the developer or any of his affiliates, the brokers conspired with the developer and the developer's friend to acquire the land through a straw buyer at a $1 million discount from the original purchase price. Taylor's summary judgment evidence, taken in the light most favorable to her, tells the following story.

### A.

It all began in November 2016, when Southeast Georgia Acquisitions, LLC ("SGA"), contracted to purchase the northern parcel of Taylor's land for $2.7 million. Soon thereafter, SGA contracted to purchase the remaining southern parcel for $2.3 million, bringing the total purchase price to $5 million. Edward Segars and Glenn Palmer—both of whom were affiliated with Nicholson-Williams, Inc. d/b/a Coldwell Banker Commercial Benchmark ("Coldwell")—acted as SGA's brokers in the deal. Their client was no stranger to the market. SGA is one of several real estate acquisition-and-

4

development companies controlled by developer Stephen Been. Other Been-controlled entities include Rock Spring Farms, LLC ("RSF") and Waterford Green, LLC ("Waterford Green").

As part of the $5 million SGA deal, Taylor allowed SGA to pursue a planned unit development ("PUD") rezoning that included a public park dedication for part of the property in exchange for a density bonus. A public park, of course, would occupy space that otherwise could accommodate more development, and therefore might devalue the land. But SGA agreed to ensure that the public park dedication was "optional under the PUD so that, in the event [SGA] fails to close or otherwise defaults," Taylor was "not required to have any portion of the Property be subject to public park dedication." The addendum fleshed out that aspect of the agreement by prohibiting SGA from encumbering the property with a public park dedication unless it could be removed through a "Small Adjustment," which involves less expense and red tape than other means of removal.

Notwithstanding these commitments to make the public park dedication optional and easily removable through a small adjustment, SGA directed the submission of PUD text that would make the public park dedication removable only by a "Major Modification," which resembles a full re-zoning and requires significantly more time and expense than a small

5

adjustment. On October 17, 2017, the PUD was issued. It included an 8.8-acre public park dedication. In accordance with SGA's submission, the PUD provided that, if "the public park is not dedicated, a Major Modification shall be required."

Having encumbered the property with a difficult-to-remove public park dedication, SGA demanded a $1 million reduction in the sale price at the November 16, 2017, closing. Taylor was not enthused. She advised Segars that if SGA did not close by 5:00 p.m. for the full contract price, she would never sell her land to SGA, Been, or any Been affiliate. Segars informed his fellow brokers that the deal was "dead" with "no chance of saving[ ]" it unless Taylor agreed to SGA's $1 million discount demand. The next day, the brokers, through Segars, presented a $4 million offer to Taylor, which she quickly rejected.

**B.**

On March 9, 2018, Taylor filed her original complaint against SGA and several other parties after they refused her demand to fund the major-modification process to remove the public park dedication. She sent a copy of the complaint to Segars, who forwarded it to the other brokers and told them that he had been in touch with Taylor.

6

While the litigation proceeded, Taylor continued to market her property. She received several offers, and she even got the property under contract for $4.75 million. But the deal fell apart. Like other developers, the prospective purchaser ultimately lost interest due to complications owing to the major modification process.

After the $4.75 million deal fell through, Taylor contacted Segars—who repeatedly had phoned her for status updates on the litigation—to inform him that the property was no longer under contract. Although motivated to sell, she told Segars that, "Stephen Been cannot be anywhere near this deal," and she would "never sell to Stephen Been, or any of his affiliates, or, in all honesty, anybody in [the] lawsuit." Segars confirmed that Coldwell understood these wishes, which Taylor expressed to him over a dozen times. Even so, he repetitively tried to convince her to sell to Been. But she remained steadfast in her opposition.

A mere eight days after the $4.75 million contract terminated, Segars, on the brokers' behalf, presented a $4 million purchase offer. That amount mirrored the amount that SGA had offered after scuttling the initial $5 million deal. In transmitting the offer to Taylor by e-mail, Segars wrote that the offeror—"Big Island Investments, LLC"—"is a Dallas, Tx group who contacted me looking for entitled residential developments in Florida." During

his discussions with Taylor, Segars assured her that Coldwell was dealing with "David Roan" of Texas-based "Big Island Investments, LLC" ("Big Island"), and that neither Mr. Been nor any of his associates, agents, or organizations were in any way related to the proposed purchase.

When Taylor indicated her plans to counteroffer, Segars tried to dissuade her, urging her to think about her grandchildren and predicting that no one else would buy the land because of the public park dedication. Taylor nevertheless submitted a $4.6 million counteroffer, but "Big Island" stood firm on the $4 million purchase price. Segars continued to urge Taylor to accept the offer, and she ultimately did so. Taylor opposed the addition of an assignment clause in the contract, but the brokers, through Segars, persuaded her that one was necessary as a standard practice when dealing with developers like "Big Island." A free assignability clause was therefore added to the contract.

## C.

At this point, careful readers may suspect where this is all headed. And, according to Taylor's summary judgment evidence, they would be right.

"Big Island" was a straw buyer, with Been and his affiliates behind the curtain—and the brokers actively helping him pull the strings and keep Taylor's suspicions at bay. Neither Segars nor the brokers had a signed

8

writing reflecting any communications with "Big Island" or "Roan" regarding the offer, much less a contract or other document permitting the brokers to represent them. Segars had prepared the offer himself, and he later testified at his deposition that, at the time he presented the offer to Taylor, he knew that Vassa Cate—Been's close friend since childhood—had signed it as "David Roan."

According to Taylor's summary judgment evidence, throughout the contract period, Segars and the other brokers continued working with Been and his affiliates to deceive Taylor. Immediately after Taylor accepted the $4 million offer, Segars sent an e-mail directly to Been, Cate, and Been's attorney, saying, "Congratulations!" After forwarding the message to Palmer—then Coldwell's executive vice president—Segars spoke with Taylor about changing the escrow agent for the transaction. Segars and the other brokers initially had suggested the law firm of Been's attorney, but Taylor flatly refused due to the association with Been. Eventually, Coldwell itself was substituted as the escrow agent, a change that Segars forwarded to Been's attorney for signature. Segars later confirmed during his deposition that all the "Big Island" contract revisions were initialed by Cate posing as Roan.

The day after Segars spoke with Taylor about changing the escrow agent, he wrote in an e-mail to Taylor—copying his supervisor, Bush—that "Big Island Investments, LLC of Dallas, TX" had deposited $50,000.00 into Coldwell's escrow account for the purchase. Issued on the date that Segars had sent Been the congratulatory e-mail, the check reflected "Big Island Investment, LLC" as the issuer. But it drew from the bank account funded by Been's Waterford Green entity.

Several days later, Segars e-mailed Been, Cate, and Been's attorney several messages that outlined the "critical dates" for the sale. Soon thereafter, Segars e-mailed Taylor an "initialed change" (in fact initialed by Cate, posing as Roan) that corrected the purchasing entity from "Big Island Investments, LLC" to "Big Island Investments, Inc." In that e-mail, Segars listed two Dallas-based addresses for Big Island. Two weeks later, a $100,000.00 check, reflecting "Big Island Investments, Inc.," was deposited into Coldwell's escrow account. Like the earlier check, it drew from the Waterford Green bank account.

On November 30, 2018, Been and his associates filed Florida articles of organization for RSF, an entity that Been wholly owns. But RSF's Sunbiz filing did not identify Been as a member, and it listed one of the Dallas addresses for "Big Island" that Segars had e-mailed to Taylor.

10

As the closing approached, Taylor asked Segars and the other brokers for the buyer's e-mail address and phone number so her attorney could contact him. Segars consulted with Coldwell supervisors Bush and Nicholson, then sent Taylor a deflecting e-mail response telling her to address her questions to the closing agent. He likewise deflected numerous text messages from Taylor that sought the buyer's contact information. At no time did Segars or any of the other brokers provide the information to Taylor.

On December 14, 2018—the date of closing—Cate signed the name "David Roan" on a document that purportedly assigned the $4 million "Big Island" contract to RSF. He would later admit that he forged both witness signatures on the document. Taylor first received a version of the assignment document around the time of closing, and she quickly confirmed RSF's ownership status through Sunbiz. Based on the Sunbiz filing, she believed that "David Roan" was the owner because the filing listed his Texas address. Ultimately, the transaction was finalized. Taylor executed a warranty deed to RSF, and Coldwell accepted an $80,000.00 commission on the $4 million sale.

It did not take long for Taylor to uncover the deception. When RSF filed its annual report on January 31, 2019, it changed its principal address to Jacksonville and listed a mailing address in St. Simons Island, Georgia—the

11

same locality in which Been and SGA reside. RSF also changed its manager to Been's attorney. In March 2019, Taylor discovered these facts, which her counsel then made the subject of formal discovery requests in her pending suit.

**D.**

Eventually, Taylor amended her complaint to add the brokers, RSF, Been, and Cate as defendants. As relevant in this appeal, in the operative complaint, Taylor stated the following causes of action against the following parties: civil fraud against Segars and Coldwell; negligent misrepresentation against Segars and Coldwell; breach of statutory duty under section 475.278, Florida Statutes, against Segars, Coldwell, Bush, and Nicholson; and negligent supervision against Coldwell, Bush, and Nicholson. Against Segars and the other brokers, she sought return of their $80,000 commission, plus a claimed $560,000 difference between the property's actual market value at the time of sale and the sale price.

Segars and the other brokers moved for summary judgment. In two substantively identical orders, the trial court granted their motions.

The court first held that the contract's non-reliance clause barred all of Taylor's claims against the brokers, citing *Billington v. Ginn-LA Pine Island, Ltd.*, 192 So. 3d 77 (Fla. 5th DCA 2016). In paragraph 21, the contract recites

that "BUYER, SELLER and Broker agree that the terms of this Agreement constitute the entire agreement between them and that they have not received or relied on any representations by Brokers or any material regarding the Property . . . that are not expressed in this Agreement." While the court acknowledged that Segars and the other brokers did not sign the contract, it held that this non-reliance clause—like the non-reliance clause at issue in *Billington*—made the brokers third-party beneficiaries.

The court next held that Taylor's statutory duty claim against the brokers failed for an additional, independent reason: "[b]y its own terms, the disclosure requirements of section 475.278, Florida Statutes, apply only to residential sales," and "[i]t is undisputed that the purchase and sale of [Taylor's] property was a commercial transaction . . . ." In the trial court's view, Taylor's claim "asserts that Segars breached a duty of honesty to her because he did not disclose that Been was involved with the ultimate buyer," and because "there was no duty to disclose this information under 475.278, the failure to disclose cannot form the basis of the breach of the duty of honesty."

The court thus granted summary judgments to Segars and the other brokers. Taylor then timely appealed from both of those orders.

## II.

We review the trial court's orders granting summary judgment de novo. *Welch v. CHLN, Inc.*, 357 So. 3d 1277, 1278 (Fla. 5th DCA 2023). To demonstrate entitlement to summary judgment, the movant must show that "there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fla. R. Civ. P. 1.510(a). When we review an order granting summary judgment, we "view[ ] the evidence in a light most favorable to the non-moving party, and a genuine dispute occurs when the evidence would allow a reasonable jury to return a verdict for that party." *Welch*, 357 So. 3d at 1278.

## III.

Taylor and the brokers first dispute whether the contract bars Taylor's claims. Taylor argues that, under *Oceanic Villas, Inc. v. Godson*, 4 So. 2d 689 (Fla. 1941), a party can bring claims sounding in fraud, misrepresentation, and breach of statutory duty to deal honestly and fairly unless the contract contains express language negating the right to bring them, and her contract contains no such express language. The brokers counter that, under our decision in *Billington*, a recitation that a party has not received or relied upon any extra-contractual representations will suffice to bar claims like Taylor's. We need not resolve this debate, because we hold

that the brokers cannot invoke the contract's non-reliance clause, whatever its scope might be.

Rather than argue that they are parties to the contract, the brokers argue that they are third-party beneficiaries of it.[2] It's axiomatic that "[a] party may qualify as a third-party beneficiary only if the contracting parties, or the contract itself, exhibits an intent to primarily and directly benefit the third party," and "[t]he best evidence of the parties' intention is the contract's plain language." *Goins v. Praetorian Ins. Co.*, 302 So. 3d 478, 479 (Fla. 5th DCA 2020) (per curiam). Here, the contract's plain language precludes any intention for the non-reliance clause to primarily and directly benefit the brokers for a simple reason: the contract, which the brokers prepared, stated that they must sign it to be bound by the paragraph containing the non-reliance clause, and the brokers didn't sign it.

Indeed, the contract language shows an unconsummated intention to make the brokers parties to—rather than third-party beneficiaries of—certain provisions. Paragraph 12, for instance, recites that "BUYER, SELLER and

---

[2] The brokers do not contend that they are parties to the contract, and thus they have waived any such argument. *Accord See Rosier v. State*, 276 So. 3d 403, 406 (Fla. 1st DCA 2019) (en banc); *J.W. v. Dep't of Children & Fams.*, 337 So. 3d 528, 529 (Fla. 5th DCA 2022) (Eisnaugle, J., concurring in result only).

Broker . . . waive any and all rights to a trial by jury in any litigation, action, or proceeding involving BUYER, SELLER or Broker, whether arising directly or indirectly from this Agreement or this transaction or relating thereto." By reciting the brokers' agreement to waive their right to a jury trial, this provision treats them as an anticipated party to paragraph 12. Moreover, paragraph 21—which contains the non-reliance clause—recites that "BUYER, SELLER and Broker agree that the terms of this Agreement constitute the entire agreement between them." This passage shows that the contract anticipates an agreement between the buyer, seller, and brokers, rather than one merely between the buyer and seller.

To be sure, the heading "END OF PURCHASE AND SALE AGREEMENT" follows the signature block for the buyer and seller, suggesting that they are the only parties to the entire contract. But reading each contract provision in context, as we must, *see Baldwin v. Harris*, 309 So. 3d 293, 295 (Fla. 5th DCA 2020), we believe paragraphs 12 and 21 show an unconsummated intention to make the brokers parties to those paragraphs, rather than an intention to make them third-party beneficiaries.

The contract not only made clear the party status that the brokers could enjoy under the non-reliance clause, but also what they must do to attain that status. After the signature block for the buyer and seller, and directly

16

following the heading, "END OF PURCHASE AND SALE AGREEMENT," the contract recites, "Broker joins in this Agreement to evidence Broker's consent to be bound by the provisions of paragraph 12 and 21 above." By failing to sign the blanks that followed, the brokers withheld their consent to be bound by paragraph 21, which contains the non-reliance clause. Given the brokers' intended party status, they cannot now invoke the non-reliance provision as third-party beneficiaries.

In rendering summary judgment, the trial court acknowledged that the brokers had not signed the contract, but it reasoned that "[t]he contract at issue in *Billington* was similarly unsigned by the broker and contained a non-reliance clause which benefited the broker." Our opinion in *Billington* does not mention this purported similarity, and the trial court therefore cannot rely on it. The Florida Supreme Court determines our precedential holdings only by looking at the facts that appear in our opinions, and we will do likewise. *See Perlow v. Berg–Perlow*, 875 So. 2d 383, 387 (Fla. 2004) (noting that facts that "do not appear on the face of" an appellate opinion "cannot be used in determining whether there is a conflict" with other appellate opinions); *Hardee v. State*, 534 So. 2d 706, 708 (Fla. 1988) ("[F]or purposes of determining conflict jurisdiction, this Court is limited to the facts which appear on the face of the opinion.").

More to the point, the trial court misapprehended what *Billington* held. *Billington* is not a third-party beneficiary case. It does not analyze whether the broker there was able to benefit from the non-reliance provision; it does not address whether the broker was a party to—or a third-party beneficiary of—the agreement. *See generally Billington*, 192 So. 3d 77. Therefore, *Billington* offers no guidance, much less any controlling decisional law, on the question whether the brokers here may claim third-party beneficiary status. And in any event, in echoing the trial court's reliance on *Billington*, the brokers here do not claim that the *Billington* contract specified the broker must sign to join in its non-reliance provision, that it provided a signature block for the broker, or that it otherwise anticipated the broker would be a party to the non-reliance provision. The existence of a broker opt-in clause (for lack of a better term) and signature block in Taylor's contract thus readily distinguishes this case from *Billington*, even as the brokers and the trial court have re-framed it. Indeed, it distinguishes this case from all third-party beneficiary cases that we have located in our research, which makes sense. In the usual course, signature blocks are for parties, and third-party beneficiary status is reserved for those who claim a benefit under the contract but had no opportunity to sign it.

The brokers do not direct our attention to any case holding that one may claim the third-party beneficiary mantle where the contract unambiguously states that he must sign it to join in the very provision from which he later seeks to benefit, and we have not found any in our own research. The apparent absence of authority for such a counterintuitive proposition does not surprise us, and we decline to endorse it here. The lynchpin of third-party beneficiary theory is intent, the contract's language is the best evidence of intent, and here, the contract unambiguously provides that the brokers must sign it to benefit from its non-reliance clause. We hold that, under the contract language at issue here, the brokers cannot invoke the non-reliance clause, and the contract therefore does not bar Taylor's claims against them.

## IV.

The brokers next argue that, at the very least, they are entitled to summary judgment on Taylor's claim for breach of statutory duty. They observe that section 475.278's disclosure requirements apply only to residential sales, and here they acted as transaction brokers for a commercial transaction. The brokers argue that they therefore had no duty to disclose to Taylor that Been was the true buyer. Taylor responds that licensees handling nonresidential transactions are exempted merely from

19

section 475.278's written disclosure requirements. She further argues that she did not sue the brokers for failing to send her written disclosures, but rather for breaching their duty to deal honestly and fairly with her. Finally, Taylor contends that the brokers' conduct entailed active dishonesty and concealment, rather than simple failures to disclose.

To referee this debate, we focus our attention on the statutory text and structure. *See Forrester v. Sch. Bd. of Sumter Cnty.*, 316 So. 3d 774, 776 (Fla. 5th DCA 2021) (Sasso, J.).[3] Section 475.278 authorizes real estate

---

[3] Taylor also invites us to consider various legislative history materials that comment on the creation of section 475.278. We decline to do so for several reasons. First, the Florida Constitution provides that a "law" consists only of a bill that has undergone the bicameralism and presentment procedures outlined in article III, sections 7 and 8. Legislative history has undergone neither procedure, and we believe that our energies are better spent analyzing the law itself than what at best we might call an unauthoritative commentary on the law. Second, legislative history offers little to assist our interpretive task as judges. We appreciate that members of the legislature often make statements about pending legislation, and legislative staff often prepare research, analyses, and impact statements for the members and committees they serve. But our task is to interpret the law according to the ordinary meaning it conveys to the public at the time of enactment, *see Leftwich v. Fla. Dep't of Corrs.*, 148 So. 3d 79, 88 (Fla. 2014), rather than the special meaning it conveys to a particular committee or legislator, much less a particular legislative staffer. Legislative history does not assist in that endeavor; to the extent it has something unique to contribute, it bears more on the latter inquiries than on the first one. Third, tools that catalogue and quantify linguistic usage—like enactment-era dictionaries and corpus linguistics—offer more probative evidence of what statutory language meant to the public at the time of enactment. *See Napolitano v. St. Joseph Catholic Church*, 308 So. 3d 274, 279 (Fla. 5th DCA 2020) (Sasso, J.); *S.C. v. State*, 224 So. 3d 249, 250 n.3 (Fla. 3d DCA 2017)

20

licensees to enter two types of brokerage relationships with buyers and sellers—the transaction broker relationship and the single agent relationship—and it prohibits them from operating as dual agents. § 475.278(1), Fla. Stat. (2022). The statute then separately enumerates, in subsections (2), (3), and (4), the duties that real estate licensees owe when they enter a transaction broker relationship, a single agent relationship, and no brokerage relationship, respectively. § 475.278(2)–(4).

Under all three circumstances, real estate licensees must "[d]eal[ ] honestly and fairly," § 475.278(2)(a), (3)(a)1., (4)(a)1., and must "[d]isclos[e] all known facts that materially affect the value of residential real property and are not readily observable," § 475.278(2)(d), (3)(a)9., (4)(a)2. Moreover, two circumstances require delivery of written disclosures: when a licensee has a single agent relationship with the buyer or seller, and when a licensee has no brokerage relationship with the buyer or seller. *See* § 475.278(3)(b),

---

(Luck, J.). Finally, we eschew legislative history to avoid the "backwards approach to statutory construction" that the Florida Supreme Court has rejected, *Halifax Hosp. Med. Ctr. v. State*, 278 So. 3d 545, 548 n.3 (Fla. 2019), and to faithfully apply the "supremacy-of-the-text principle" that it has articulated, *Forrester*, 316 So. 3d at 776.

(4)(b).[4] Under headings titled "Disclosure requirements," the statute specifies, in detail, what those written disclosures must contain and when licensees must make them. *See id.* It then specifies the form that these written disclosures must take. § 475.278(3)(c), (4)(c).

Section 475.278(5) goes on to recite that "[t]he real estate licensee disclosure requirements of this section apply to all residential sales" and "do not apply to . . . nonresidential transactions[.]" § 475.278(5)(a), (5)(b)2. Section 475.274, in turn, reiterates that "[t]he disclosure requirements of § 475.278 apply only to residential sales[.]" § 475.274, Fla. Stat. (2022).

The brokers urge us to categorize section 475.278's duty of honest and fair dealing as a "disclosure requirement," at least insofar as its breach might entail a failure to disclose information. We find the brokers' argument unpersuasive.

At the outset, the brokers' approach flouts the statute's own categorization of the various duties it imposes. As we recite above, section 475.278 imposes several duties that it expressly calls "[d]isclosure requirements" and duties of "disclosing" certain information. The duty of

---

[4] There is no longer a comparable written disclosures requirement for transaction brokers; a provision that contained one sunset in 2008. *See* § 475.278(2); 2003-164 § 36, Laws of Fla.

22

honest and fair dealing is not one of them. The plain text of the statute thus makes clear that the duty of honest and fair dealing is not a disclosure requirement.

Moreover, a consideration of the full list of broker duties set forth in section 475.278 confirms our interpretation of the statute. For example, the statute imposes on all licensees not only a duty of honest and fair dealing, but also a duty of "[a]ccounting for all funds." § 475.278(2)(b), (3)(a)6., (4)(a)3. And it imposes on both transaction brokers and single agents a duty of "[p]resenting all offers and counteroffers in a timely manner[.]" § 475.278(2)(e), (3)(a)8. Under the brokers' approach, each of these duties will evaporate during nonresidential transactions, as their breach often will entail alleged failures to disclose information. To borrow a phrase, the brokers ask us to find a duty-killing elephant in a non-disclosure mousehole. *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).

For both of the above reasons, the statutory text and structure preclude us from categorizing the duty of honest and fair dealing as a "disclosure requirement," and we therefore reject the brokers' attack on Taylor's breach-of-statutory-duty claim. But even putting that point aside, the brokers' argument falls short on its own terms because it incorrectly presumes that Taylor's claim is based solely on a simple failure to disclose. Indeed, even if

23

Taylor could not rest her claim on the brokers' failure to disclose Been's connection with the deal (a premise we reject under the plain language of the statute), she has pled and produced evidence of far more than mere nondisclosure.

In the operative complaint, Taylor supported her breach of statutory duty claim with an allegation that the brokers "intentionally or negligently misrepresented the Property's true buyer (Mr. Been) to Mrs. Taylor to induce her to sell the property to an entity that Mr. Been owned and controlled." And she produced ample evidence of misrepresentation and concealment at summary judgment. From their verbal and e-mail communications to the contract they drafted, the brokers made numerous false representations to Taylor that "Big Island" was a "Texas" company headed by "David Roan," that "Big Island" was unaffiliated with Been, and that "Big Island" was the buyer of the property. The brokers accompanied these falsehoods with various efforts to conceal them. These actions extend well beyond simple nondisclosure. And by any measure of the ordinary meaning of the phrase "honestly and fairly," a jury could well conclude that the brokers' deceptive communications and conduct failed to live up to that standard. *See Webster's Encyclopedic Unabridged Dictionary of the English Language* 692 (1996 ed.) (defining "fair" as "free from bias, dishonesty, or injustice" and "legitimately

24

sought, pursued, done, given, etc."); *id.* at 917 (defining "honest" as "honorable in principles, intentions, and actions; upright and fair"); *id.* at 917 (defining "honesty" as "truthfulness, sincerity, or frankness" and "freedom from deceit or fraud").[5]

In sum, we reject the brokers' attack on Taylor's section 475.278 claim for two reasons. First, under the statutory language and structure, the duty to deal honestly and fairly is not a "disclosure requirement" from which nonresidential transactions are exempt. And second, even taking the brokers' argument on its own terms and assuming *arguendo* that Taylor could not premise her claim on failures to disclose, Taylor has produced summary judgment evidence from which a reasonable jury could conclude that the brokers engaged in active dishonesty and concealment—conduct that extends beyond mere nondisclosure. We therefore hold that the brokers are not entitled to summary judgment on Taylor's breach of statutory duty claim.

## V.

The brokers press one more ground for affirmance: Taylor's purported inability to show damages flowing from her claims against them. As the

---

[5] We cite an older edition because section 475.278 was enacted in 1997. *See S.C.*, 224 So. 3d at 250 n.3; ch. 1997-42 § 3, Laws of Fla.

brokers observe, under the "tipsy coachman" doctrine, we may affirm the trial court's judgments, even if they rest on the wrong reasons, so long as the record provides any basis that supports them. *See Deriso v. State*, 221 So. 3d 1231, 1234 n.1 (Fla. 5th DCA 2017). Here, our undeveloped record does not clearly preclude Taylor from recovering, at the very least, the brokers' allegedly ill-gotten commission. *See Crosby v. Ashley*, 291 So. 2d 12, 13 (Fla. 3d DCA 1974). Therefore, we must reject the brokers' tipsy coachman argument and leave the issue of damages to the trial court in the first instance.

## VI.

For the foregoing reasons, we REVERSE the trial court's summary judgments and REMAND these cases for further proceedings consistent with our opinion.

EDWARDS, C.J., and EISNAUGLE, J., concur.